**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE EASYSAVER REWARDS LITIGATION, | No. 16-56307 |
| | D.C. No. 3:09-cv-02094-BAS-WVG |
| JOSUE ROMERO; DEANNA HUNT; KIMBERLY KENYON; GINA BAILEY; ALISSA HERBST; GRANT JENKINS; BRADLEY BERENTSON; JENNIFER LAWLER; DANIEL COX; JONATHAN WALTER; CHRISTOPHER DICKEY, *Plaintiffs-Appellees*, | |
| | OPINION |
| v. | |
| BRIAN PERRYMAN, *Objector-Appellant*, | |
| v. | |
| PROVIDE COMMERCE, INC.; REGENT GROUP, INC., a California corporation, DBA Encore Marketing International; ENCORE MARKETING INTERNATIONAL, INC., a Delaware corporation, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Southern District of California
Cynthia A. Bashant, District Judge, Presiding

Argued and Submitted May 17, 2018
San Francisco, California

Filed October 3, 2018

Before:  N. Randy Smith and Michelle T. Friedland, Circuit
Judges, and Barbara M. G. Lynn,[*] Chief District Judge.

Opinion by Judge Friedland

## SUMMARY[**]

### Class Action / Settlement

The panel vacated the award of attorney's fees but
otherwise affirmed the district court's approval of a class
action settlement in an appeal brought by an objecting class
member, challenging the settlement resolving claims that
Provide Commerce, Inc. and Regent Group, Inc. enrolled
consumers in a membership rewards program without their
consent and mishandled their billing information.

---

[*] The Honorable Barbara M. G. Lynn, Chief United States District
Judge for the Northern District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

The settlement made available $3.5 million to pay settlement administration costs and refund class members' enrollment fees, with any remaining funds designated for three *cy pres* beneficiaries. The settlement also provided that each class member would receive a $20 credit that may be used to purchase additional products from defendants. The settlement anticipated that class counsel would receive $8.7 million in attorney's fees.

The panel vacated the fee award because the district court failed to treat the credits as coupons under the Class Action Fairness Act when calculating that award. The panel held that because the district court incorporated the full face value of the coupons into both its percentage-of-recovery calculation and lodestar calculation of the attorney's fee award, the error required recalculation of the fee award.

The panel held that the district court did not abuse its discretion in approving the use of *cy pres* here or in approving the particular recipients. The panel also held that the district court did not abuse its discretion in rejecting the Objector's two proposed alternatives for distributing the remaining funds.

Finally, given both the structure of this settlement agreement and the focus of Objector's challenges, the panel held that it was unnecessary to reverse the entire settlement approval in conjunction with the panel's vacatur of the fee award.

**COUNSEL**

Theodore H. Frank (argued) and Adam E. Schulman, Competitive Enterprise Institute, Center for Class Action

Fairness, Washington, D.C., for Objector-Appellant Brian Perryman.

Bruce Steckler (argued), Steckler Law Group LLP, Dallas, Texas; Jennie Lee Anderson, Andrus Anderson LLP, San Francisco, California; James R. Patterson, The Patterson Law Group, San Diego, California; and Michael Singer, Cohelan Khoury & Singer, San Diego, California, for Plaintiffs-Appellees Josue Romero, Deanna Hunt, Kimberly Kenyon, Gina Bailey, Alissa Herbst, Grant Jenkins, Bradley Berentson, Jennifer Lawler, Daniel Cox, Jonathan Walker, and Christopher Dickey.

Leo P. Norton (argued), Michael G. Rhodes, and Michelle C. Doolin, Cooley LLP, San Diego, California, for Defendant-Appellee Provide Commerce, Inc.

Myron M. Cherry and Jacie C. Zolna, Myron M. Cherry & Associates LLC, Chicago, Illinois, for Defendant-Appellee Regent Group, Inc.

Oramel H. (O.H.) Skinner (argued), Paul N. Watkins, and Dana R. Vogel, Assistant Attorneys General; Mark Brnovich, Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; for Amici Curiae Thirteen State Attorneys General.

Wilber H. Boies and Timothy M. Kennedy, McDermott Will & Emery LLP, Chicago, Illinois; Jessica Mariani, McDermott Will & Emery LLP, Los Angeles, California; Robert Kline, McDermott Will & Emery LLP, Miami, Florida; for Amici Curiae National Legal Aid and Defender Association, Association of Pro Bono Counsel, Legal Aid Association of California and 24 of its member organizations, California Bar Foundation, Equal Rights

Advocates, Family and Children's Law Center, Columbia Legal Services, Hawaii Justice Foundation, Legal Aid Center of Southern Nevada, Montana Justice Foundation, Northwest Immigrant Rights Project, Washoe Legal Services, and William E. Morris Institute for Justice.

## OPINION

FRIEDLAND, Circuit Judge:

In this appeal, an objecting class member challenges the district court's approval of a class action settlement resolving claims that Provide Commerce, Inc. and Regent Group, Inc. (collectively, "Defendants") enrolled consumers in a membership rewards program without their consent and then mishandled their billing information. The settlement makes available $3.5 million to pay settlement administration costs and refund class members' enrollment fees, with any remaining funds designated for three *cy pres* beneficiaries. The settlement also provides that each class member will receive a $20 credit that may be used to purchase additional products from Defendants. It further anticipates that class counsel will receive $8.7 million in attorney's fees. We vacate the fee award because the district court failed to treat the credits as coupons under the Class Action Fairness Act ("CAFA") when calculating that award. We otherwise affirm.

## I.

Provide Commerce, Inc. ("Provide") operates online businesses that sell flowers, chocolates, fruit baskets, and other similar items. According to the Complaint, Plaintiff Josue Romero and seven other class representatives (collectively, "Plaintiffs") purchased items from a Provide

business and were then presented with a pop-up advertisement for $15 off another item from the same website.[1]   Clicking the pop-up directed Plaintiffs to a different website and instructed them to enter their contact information and click "Accept."  This process (irrespective of whether Plaintiffs entered their contact information or clicked "Accept") enrolled Plaintiffs in Provide's membership rewards program.  Provide then transmitted Plaintiffs' payment information to a separate company, Regent Group, Inc. ("Regent"), which proceeded to charge Plaintiffs a $1.95 activation fee and a recurring $14.95 monthly membership fee.  Plaintiffs did not consent to joining the rewards program or, by extension, to having their data transferred to Regent.  Plaintiffs also never received "the promised coupons, gift codes, or any other savings benefits."

In 2009, Plaintiffs filed a putative class action against Defendants in the Southern District of California, alleging violations of various state laws arising from Defendants' operation of their membership rewards program.  After more than two years of litigation, including extensive discovery and mediation, the parties agreed to settle.  The proposed settlement provided class members with two forms of relief: monetary reimbursement of membership fees upon submission of a claim and a $20 credit.

The settlement established a $12.5 million fund from which Defendants would pay up to $8.7 million in attorney's fees; $80,000 in enhancement awards to the named plaintiffs; and $200,000 in litigation costs.  The approximately $3.5 million remaining would be available to

---

[1] We draw the background facts from Plaintiffs' Complaint. Because the case settled, the truth of Plaintiffs' allegations is not at issue.

fund the settlement's administration costs and to reimburse class members for their membership fees "on a pro rata basis up to the full amount owed." To receive such a refund, class members had to submit a claim affirming that they had neither intended to enroll in the program nor used any program benefits other than the initial discount code. After the refunds were issued, any remaining funds were to be distributed as a *cy pres* award to San Diego State University, the University of California at San Diego, and the University of San Diego School of Law "for a chair, professorship, fellowship, lectureship, seminar series or similar funding, gift, or donation program . . . regarding internet privacy or internet data security."

The settlement also directed Defendants to email every class member a $20 credit that could be used to purchase items on Defendants' websites. Unlike with the refund, class members were not required to submit a claim to receive the credit. The credits would be fully transferable, but they would include a series of restrictions, including that they would expire one year after their distribution date and could not be used in the lead-up to Christmas, Valentine's Day, or Mother's Day. The credits also could not be used for same-day orders, nor could they be combined with other promotions.

In June 2012, the district court preliminarily approved the settlement. The parties informed the court that the class contained approximately 1.3 million consumers who had been enrolled in the rewards program at some point since August 2005.

Class members were then notified of the settlement and given a 135-day period to request a refund, during which only about 3,000 class members did so. Their submitted claims requested a total of $225,000 in cash refunds, leaving

approximately $3 million of the settlement's cash fund to be distributed to the *cy pres* beneficiaries.[2]  Separately, class counsel moved for $8.7 million in fees and $200,000 in costs.[3]

In January 2013, the district court held a final settlement approval hearing at which class member Brian Perryman ("Objector") objected to the settlement.  He argued that the attorney's fee award did not comply with CAFA's requirements for settlements awarding coupons and that the *cy pres* award was improper.  The court rejected these objections and issued a final order approving both the settlement and class counsel's accompanying fee request. The district court's order placed the full settlement value at $38 million, including $12.5 million for the cash fund and $25.5 million for the $20 credits to be distributed to the approximately 1.3 million class members.  Objector appealed, and we vacated and remanded for further proceedings in light of our decision in *In re Online DVD-Rental Antitrust Litigation* (*In re Online DVD*), 779 F.3d 934 (9th Cir. 2015), which addressed CAFA's coupon settlement provisions.

On remand, the district court determined that, under *In re Online DVD*, the credits should not be construed as coupons, and that it was therefore unnecessary to apply CAFA's requirements for coupon settlements.  In the court's view, it was particularly significant that class members had, by virtue of their inclusion in the class, shown "an interest in

---

[2] The 135-day claims period was later extended, but it appears from the record and briefing before our court that the number of refund requests did not significantly increase.

[3] Under the settlement agreement, "class counsel" refers to the four law firms representing Plaintiffs in this case.

getting $15.00 off their next purchase" from Defendants. Considering this factor in conjunction with the holding of *In re Online DVD*, the court concluded the "settlement was not a coupon settlement subject to the strictures of section 1712."

Again using $38 million as the total value of the settlement, the court then approved the fee award based on both percentage-of-recovery and lodestar calculations.[4] Under the percentage-of-recovery method, the court concluded that an $8.7 million attorney's fee award was reasonable because it represented 23% of the settlement value—below the 25% benchmark typically used in our circuit. The court then cross-checked the reasonableness of the award using the lodestar method. Based on declarations reciting the hours spent by class counsel on this case and their hourly rates, class counsel's fees came to approximately $4.3 million. The court decided that class counsel's rates and hours were reasonable and, further, that a multiplier of two—necessary for the lodestar figure to match the $8.7 million awarded under the settlement—was appropriate. As a result, the court reinstated its prior approval of the settlement and the fee award.

Objector has appealed again to challenge the attorney's fee and *cy pres* awards. With respect to the fee award, he

---

[4] Under the "percentage-of-recovery method," a fee award is calculated as a percentage of the settlement fund. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). By contrast, the lodestar method entails "multiplying the number of hours the prevailing party reasonably expended on the litigation . . . by a reasonable hourly rate." *Id.* at 941. The lodestar method then allows the court to "adjust [the lodestar fee] upward or downward" based on a range of considerations, chief among them "the benefit obtained for the class." *Id.* at 941–42.

argues that the district court erred by failing to comply with CAFA's requirements for coupon settlements and, relatedly, that the settlement provides class counsel with a disproportionate share of the recovery. With respect to the *cy pres* award, he contends that *cy pres* relief is not appropriate here and that, even if it were, the district court should have rejected the particular *cy pres* beneficiaries chosen in the settlement.

## II.

We address Objector's arguments in turn. We hold that his challenge to the attorney's fee award succeeds because the district court failed to treat the $20 credits as coupons under CAFA, but we reject his *cy pres* arguments.

## A.

CAFA imposes restrictions on attorney's fee awards for class action settlements that provide class members relief in the form of coupons. *See* 28 U.S.C. § 1712. Congress targeted such settlements for heightened scrutiny out of a concern that the full value of coupons was being used to support large awards of attorney's fees regardless of whether class members had any interest in using the coupons. *See* S. Rep. No. 109-14, at 15–20 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 15–20 (listing examples of settlements "in which most—if not all—of the monetary benefits went to the class counsel, rather than the class members those attorneys were supposed to be representing"). More specifically, Congress was concerned that when coupons that class members would not use were factored into the value of a settlement, they inflated the nominal size of a settlement fund without a concomitant increase in the actual value of relief for the class. *See id.* at 29–30. And when a court relied on the size of such a settlement fund to calculate attorney's

fees, this inflation dramatically increased the size of the fee award—allowing class counsel to reap the lion's share of the benefits. *See id.*

To avoid this result, CAFA requires district courts to consider the value of only those coupons "that were actually redeemed" when calculating the relief awarded to a class. *In re Online DVD*, 779 F.3d 934, 950 (9th Cir. 2015); *see also* 28 U.S.C. § 1712(a). Doing so ensures that class counsel benefit only from coupons that provide actual relief to the class, lessening the incentive to seek an award of coupons that class members have little interest in using—either because they might not want to conduct more business with defendants, or because the coupons are too small to make it worth their while. *See In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015) ("The potential for abuse is greatest when the coupons have value only if a class member is willing to do business again with the defendant who has injured her in some way, when the coupons have modest value compared to the new purchase for which they must be used, and when the coupons expire soon, are not transferable, and/or cannot be aggregated.").

CAFA, however, provides no definition of "coupon," so courts have been left to define that term on their own, informed by § 1712's animating purpose of preventing settlements that award excessive fees while leaving class members with "nothing more than promotional coupons to purchase more products from the defendants." *In re Online DVD*, 779 F.3d at 950 (quoting S. Rep. No. 109-14, at 15).[5]

---

[5] As in *In re Online DVD*, we need not decide which standard of review governs our review of whether a credit is a coupon within the meaning of CAFA, because here the district court applied the wrong legal rule when evaluating whether the credits qualify as coupons. *See*

In *In re Online DVD*, we outlined three factors to guide this inquiry: (1) whether class members have "to hand over more of their own money before they can take advantage of" a credit, (2) whether the credit is valid only "for select products or services," and (3) how much flexibility the credit provides, including whether it expires or is freely transferrable. *In re Online DVD*, 779 F.3d at 951. Applying these factors, we held that a $12 gift card to Walmart, awarded as part of a settlement resolving antitrust claims relating to its DVD rentals and sales, did not qualify as a coupon. *Id.* at 951–52. We first explained that a "class member need not spend any of his or her own money" to use the gift card given Walmart's extensive inventory of low-cost products. *Id.* at 951. Relatedly, the gift card provided "not merely the ability to purchase an entire product as opposed to simply reducing the purchase price, but also the ability to purchase one of many different types of products," including numerous products unrelated to DVDs. *Id.* at 952. The gift cards also did not expire and were freely transferable. *Id.* at 951. Finally, class members could receive $12 in cash instead of the $12 gift card, if they made a request by mail. *Id.* at 941. In light of all these factors giving class members significantly more flexibility than typical coupons, we held that the gift cards were not coupons within the meaning of CAFA. *Id.* at 951–52.

Here, the district court relied on an additional factor not present in *In re Online DVD*. It held that the credits should

---

779 F.3d at 950 n.8 (explaining that it was unnecessary to decide on the applicable standard of review because we would affirm under any standard). Failing to identify the correct legal standard constitutes reversible error even under abuse of discretion review. *See Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011).

not be construed as coupons in part because it concluded that this settlement was "stronger than" the settlement in *In re Online DVD* in terms of how closely the relief matched class members' alleged injury. In this case, class members failed to receive a promised credit or received a credit but on terms they had not accepted, and the settlement provided a replacement credit without the unwanted enrollment in its rewards program. But the district court's inclusion of this factor conflated the coupon analysis with whether the settlement was fair and reasonable. Confronting a similar argument in *In re Southwest Airlines Voucher Litigation*, the Seventh Circuit held that drink vouchers awarded to settle claims that Southwest improperly stopped accepting certain in-flight drink vouchers were coupons under CAFA. 799 F.3d at 704. Even though class members would receive "essentially complete relief" by obtaining the new drink vouchers to replace their invalidated ones, *id.* at 711, the court explained that this equivalence bore on the fairness of the settlement—not on whether the vouchers were coupons under CAFA, *id.* at 706.

Thus, even assuming the district court was correct that "this settlement was specifically tailored to the harm suffered by the class members and the interest they had in receiving" a discount off a future purchase from Defendants' websites, it does not follow that the full face value of all the $20 credits should be used when evaluating the propriety of the fee award.[6] Regardless of the substance of the underlying claim or injury, CAFA prevents settling parties from valuing coupons at face value without accounting for their redemption rate. Accordingly, the district court erred

---

[6] And to the extent the settling parties are correct that class members have a strong interest in receiving these coupons, the coupon redemption rate should reflect that interest.

by incorporating an improper factor into its analysis of whether the credit was a coupon under CAFA. *See Enyart*, 630 F.3d at 1159 ("If the [district] court failed to [identify the correct legal rule], we must conclude it abused its discretion." (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc))).

That brings us to the million—here, multi-million—dollar question: whether Defendants' credits are coupons. We hold that, applying the correct legal standard, the only logical conclusion is that they are.[7]  To begin, the credits are categorically different from the Walmart gift cards. Defendants are decidedly not "giant . . . retailer[s]" in the mold of Walmart or other similar stores, *In re Online DVD*, 779 F.3d at 951, and class members can only use the credits to purchase items from a limited universe of products: flowers, chocolates, and other similar gifts.  This universe is even smaller if confined to products that class members can purchase without spending any of their own money—Defendants only claim to sell "15–25 products" for under

---

[7] Thus, even if abuse of discretion review rather than de novo review applies, *see supra* n.5, we must reverse.  As explained below, *see supra* n.8, the district court lacked support for its conclusion that this settlement was comparable to *In re Online DVD* in terms of how many items class members could purchase.  Because that was the only factor the district court identified as supporting its decision that would be relevant under the correct legal standard, and because that factor lacks evidentiary support, there are no factors remaining that might weigh in favor of categorizing the credits as coupons.  Accordingly, there is no need to provide the district court an opportunity to reevaluate whether the credits qualify as coupons.  *See Apache Survival Coalition v. United States*, 21 F.3d 895, 906–07 (9th Cir. 1994) (explaining that we need not remand where the district court abused its discretion by applying the incorrect legal standard if there are no underlying factual disputes and it is in the interest of judicial economy to decide the issue on appeal).

$20. And that meager list does not even account for shipping charges. When asked in the fairness hearing whether class members could purchase *anything* from one of Defendants' websites for $20 or under if shipping charges are included, counsel responded: "If you include shipping, I'm not sure, but the defendants don't make money off the shipping." Regardless of whether money spent on shipping benefits Defendants, however, class members who spend money on shipping are required "to hand over more of their own money before they can take advantage of the coupon," *In re Online DVD*, 779 F.3d at 951.[8]

Moreover, in *In re Online DVD*, Walmart's extensive inventory was significant in part because class members could use the gift cards without obtaining the product— DVDs—that led to their suit in the first place. *See id.* at 952. Here, in contrast, class members cannot use these credits without purchasing an item from Defendants. And, to do so, they must hand over their billing information again to the very company that they believe mishandled that information in the first place, at the very least to pay for shipping. Thus, although class members do not have a product-specific complaint, they cannot reap the benefits of the settlement

---

[8] In light of the undisputed evidence that there were at most 25 and possibly zero products class members could purchase without spending any of their own money, the district court lacked support for its conclusion that this settlement was comparable to the settlement from *In re Online DVD* with respect to the number of such products. Even putting aside shipping charges, a range of 15–25 products is in a different realm than the enormous number of products that Walmart sells for under $12. Although class members were generally "not limited to [the] purchase of a specific item or set of items," Defendants' inventory is simply not comparable to the size or breadth of Walmart's inventory.

without reengaging in the same purchasing activity that they believe led to their injury.

The credits at issue here are also far less flexible than those available in *In re Online DVD*. Although freely transferrable, they expire one year after issuance and have a series of blackout periods, including during the days before Valentine's Day, Mother's Day, and other holidays on which consumers most often buy flowers and chocolates. Defendants respond that there is a "reasonable explanation" for those restrictions given their need to preserve their ability to fill and deliver orders in a timely fashion "during peak periods." Maybe so, but the credits still cannot be used in anywhere near the same way as cash—including because they cannot be used on the dates on which people would be most interested in using them.

Plaintiffs stress that class members here could receive both cash (in the amount needed to refund their membership fees) and a gift card, while class members in *In re Online DVD* had to choose either a $12 gift card *or* $12 in cash. *See In re Online DVD*, 779 F.3d at 952. But the fact that the *In re Online DVD* plaintiffs had a choice between cash and a gift card worth the same amount made it easier for us to assess the value of the gift cards. Class members who selected gift cards must have valued them at close to face value, because they selected them over essentially the same value in cash.[9] *See id.* at 952 n.11. It was therefore appropriate to treat the *In re Online DVD* settlement as

---

[9] The only difference in value between the gift card and the cash award in *In re Online DVD* was the cost of a stamp. Although a class member could submit a claim for a Walmart gift card online, a claim for cash could only be submitted by regular mail. *See In re Online DVD*, 779 F.3d at 941.

similar to an all-cash settlement. *See id.* Here, however, it is impossible to draw the same conclusion—nothing in the record could have given the district court reason to believe that any class member, let alone all class members, would have viewed the $20 credit as equivalently useful to $20 in cash.

For all these reasons, we conclude that the only logical conclusion under the correct legal rule is that these credits are coupons under CAFA.

## B.

Because the district court incorporated the full face value of the coupons into both its percentage-of-recovery calculation and lodestar calculation of the attorney's fee award, this error requires recalculation of the fee award.

When a fee award in a coupon settlement is calculated using the percentage-of-recovery method, CAFA requires that any calculation of the size of the settlement fund—and thus the size of the fee award—be determined using the redemption rate of the coupons. *Id.* at 949–50; *see also* 28 U.S.C. § 1712(a) ("If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.").[10]    Here, the district court approved the settlement under the percentage-of-recovery method on the

---

[10] As we have previously, we note that § 1712 did not escape CAFA's generally "'clumsy' and 'bewildering' wording." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1181 (9th Cir. 2013) (quoting *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681, 686 (9th Cir. 2006)).

basis that the $8.7 million award represented only 23% of the total $38 million recovery, which the court viewed as appropriately below the 25% "benchmark" we have generally held to be "reasonable." *In re Bluetooth Headset Prods. Liab. Litig.* (*In re Bluetooth*), 654 F.3d 935, 942 (9th Cir. 2011). But because the $38 million figure did not account for the redemption rate of the credits, it is unclear whether the fee award is in fact a reasonable percentage of the settlement fund. Absent the redemption information, we cannot approve the district court's percentage-of-recovery evaluation.

The settling parties contend that the award can nevertheless be upheld based on the district court's lodestar calculation. Under § 1712(b)(1), which relates to "[o]ther attorney's fee awards" in settlements involving coupons, if "a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action." Section 1712(b)(2) further provides that "[n]othing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees."[11]    CAFA thus allows courts to use the lodestar

---

[11] Section 1712 contains three subsections that govern the calculation of attorney's fees. *See* 28 U.S.C. § 1712(a)–(c). In *In re HP Inkjet Printer Litigation*, we explained that § 1712(a) "requires that 'any attorney's fee' awarded for obtaining coupon relief be calculated using the redemption value of the coupons" and thus mandates the use of the percentage-of-recovery method for any portion of the attorney's fees in a class action settlement that are "attributable to" the award of coupons. 716 F.3d at 1183–84 (quoting 28 U.S.C. § 1712(a)). By contrast, we explained that § 1712(b) "come[s] into play when a settlement contains both coupon relief and *equitable* relief," and the court uses the lodestar method as any part of its fee calculation. *Id.* at 1185 (emphasis added).

approach to determine any portion of attorney's fees not attributable to coupons in mixed settlements that award both coupons and non-coupon relief.

In *In re HP Inkjet Printer Litigation* (*In re HP*), 716 F.3d 1173 (9th Cir. 2013), we explained that CAFA does not, however, permit a district court to approximate "the ultimate value of [a] settlement, and then award[] fees in exchange for obtaining coupon relief without considering the redemption value of the coupons." *Id.* at 1186. In particular, in a mixed settlement, a district court may use the lodestar approach provided that it does so without reference to the dollar value of the settlement fund—or, of course, it may reference the dollar value of the settlement fund if it accounts for the redemption rate of the coupons in calculating that dollar value. We held that the district court in *In re HP* had erred when it set the lodestar fee award in reference to "the 'ultimate value' of th[e] settlement"—which, as calculated there, included the face value of the coupons not adjusted by their redemption rate. *Id.*

Here, the district court similarly went astray when it reverse-engineered the lodestar multiplier using a value of the settlement that included the full face value of all the $20 coupons. The court started with a lodestar fee of $4.3 million, calculated based solely on class counsel's billing rates and hours worked. But the court then worked

---

By its terms, § 1712(c) provides further instruction regarding settlements that include "an award of coupons to class members and also provide[] for equitable relief, including injunctive relief." 28 U.S.C. § 1712(c). Although settlements like this one that award coupons and monetary relief are not expressly mentioned in *In re HP*, it must be the case that § 1712(b) also encompasses the use of the lodestar method for this type of mixed settlement. Such settlements would otherwise exist in a no-man's land with no guidance from § 1712.

backward from class counsel's proposed $8.7 million fee award, which the court had already deemed appropriate as a percentage of the total dollar value of the settlement fund. To do so, the court applied a multiplier of 2.1 to match the lodestar fee with the percentage-of-recovery fee. Thus, although the $4.3 million figure was derived independently of any specific consideration of the coupons, it lost this independence when the district court used a multiplier to match the lodestar fee to the percentage-of-recovery fee— which was, by definition, a percentage of the full value of the settlement, including the face value of the coupons.[12]

---

[12] We recognize that "the benefit obtained for the class" is the "[f]oremost" consideration for a district court in assessing whether it should adjust a lodestar fee. *In re Bluetooth*, 654 F.3d at 942. Likewise, the results obtained may factor into a district court's assessment of the hours reasonably expended on the litigation. *See Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1211 (9th Cir. 1986), *opinion amended on denial of reh'g*, 808 F.2d 1373 (9th Cir. 1987). But it may be possible in some cases for a district court to evaluate the reasonableness of the hours expended and whether "the level of success achieved by the plaintiff" warrants an upward or downward departure without considering the award of coupons at all. *See id.* at 942 (quoting *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009)). In other words, a district court may be able to determine an appropriate lodestar fee and whether a departure is called for by assessing how fully an individual class member is compensated for his or her injuries, without reference to the size of the class or the size of the settlement fund as a whole. On the other hand, if attorneys argue for or against a lodestar fee or departure based at all on the benefits of the coupons obtained, then the district court must consider the redemption rate when ruling on their request. Of course, because adjustments to the lodestar fee should be "the exception rather than the rule," *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002) (quoting *D'Emanuele v. Montgomery Ward & Co.*, 904 F.2d 1379, 1383 (9th Cir. 1990), *overruled on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992)), courts should not need to use a departure at all in most cases.

The value of the coupon relief therefore impermissibly informed the district court's approval of the lodestar fee.

Accordingly, the attorney's fee award must be vacated. On remand, the award should be recalculated in a manner that treats the $20 credits as coupons under CAFA.[13] Because we hold that the fee award must be recalculated, we need not address Objector's separate argument that the settlement disproportionately benefits class counsel at the expense of the class. And, in any event, that argument largely collapses into Objector's challenge to the fee award under CAFA.

## C.

Objector also challenges the use of *cy pres* to distribute the remaining settlement funds, and, if *cy pres* is to be used at all, the choice of recipients. We hold that it was not an abuse of discretion for the district court to approve the use of *cy pres* here or to approve these particular recipients.

## 1.

*Cy pres* provides a mechanism for distributing unclaimed funds "to the 'next best' class of beneficiaries." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011). Under the *cy pres* approach, "class members receive an

---

[13] Because the settlement dictates that the $20 credits will not be distributed until after the final settlement approval, it is impossible to calculate their redemption rate while the settlement is still pending. But, as we explained in *In re HP*, there are ways for the parties to address this challenge. *See In re HP*, 716 F.3d at 1186 n.19. As one example, "a fees award can be bifurcated or staggered to take into account the speculative nature of at least a portion of a class recovery." *Id.* Alternatively, the parties could amend the settlement so that the redemption rate will be ascertainable before the entry of final judgment.

indirect benefit (usually through defendant donations to a third party) rather than a direct monetary payment." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012). The settlement agreement here provides for any unclaimed funds to be distributed to San Diego State University, the University of California at San Diego, and the University of San Diego School of Law to support scholarship in the area of internet privacy and data security. Objector argues that the approximately $3 million remaining in the settlement fund should have been distributed to the class instead.

We conclude that it was reasonable for the district court to approve the use of a *cy pres* distribution. The availability of *cy pres* as a mechanism to distribute unclaimed funds rests on the premise that class action settlements will sometimes have just that—unclaimed funds. A settlement is not fatally flawed solely because class members did not deplete the entirety of the settlement fund. If it were, *cy pres* would not exist. Objector suggests that the parties should have spent more on supplemental notice and outreach to non-claimants. But that contention could be made about any class action with remaining funds, and Objector has not identified any flaws in the notice procedure used in this case.

Nor was it an abuse of discretion for the district court to reject Objector's two proposed alternatives for distributing the remaining funds. Objector first suggests that the settlement should have distributed the remaining funds to the existing claimants. But the district court was under no obligation to adopt a distribution approach that might overcompensate claimants, all of whom will already be fully reimbursed for the money they lost through the rewards program.

Objector alternatively suggests that the remaining funds should have been distributed pro rata to non-claimant class

members, whom Defendants will have to identify to distribute the coupons. It might be technically feasible to distribute the funds in this manner. But given that the existing fund contains approximately $3 million, and that there are over a million non-claimants, each non-claimant's recovery would be "*de minimis*," *Lane*, 696 F.3d at 821, particularly once the costs of distribution are deducted. Even if the district court substantially reduces the attorney's fee award, the amount each non-claimant might receive compared to the administrative costs of distribution prevents Objector from showing that the parties' resort to *cy pres* was inappropriate.

## 2.

The recipients of *cy pres* funding should be selected in light of "the objectives of the underlying statute(s)" and "the interests of the silent class members." *Nachshin*, 663 F.3d at 1039. The court has "broad discretionary powers in shaping" a *cy pres* award. *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990). We therefore review the selection of *cy pres* recipients for an abuse of discretion. *Nachshin*, 663 F.3d at 1038.

Objector argues that, even if a *cy pres* distribution was permissible here, these universities were inappropriate recipients because (i) all three are located in San Diego, even though the case involves a nationwide class; and (ii) three of the attorneys working on the case graduated from the University of San Diego School of Law. We disagree on both counts.

## i.

Objector's geographic challenge fails because these beneficiaries have a nationwide reach sufficient to justify

their receipt of the *cy pres* award.  Although the universities are all based in San Diego, it was reasonable for the district court to conclude that "the . . . funded academic programs will have a nation-wide impact."  The award is designed to support scholarship in internet privacy and data security—topics of national scope.  That the research will be spearheaded by scholars in San Diego in no way means that its impact will be confined to San Diego.[14]  In addition, Objector's singular focus on geography ignores the touchstone of the inquiry: whether an award bears a "substantial nexus to the interests of the class members." *Lane*, 696 F.3d at 821; *see also In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 36 (1st Cir. 2012) ("It is not the location of the recipient which is key; it is whether the projects funded will provide 'next best' relief to the class."). Because this award funds research that is directly responsive to the issues underlying this litigation, the physical location of the beneficiaries is not an overriding consideration.

Objector's contrary argument based on *Nachshin v. AOL, LLC* is unavailing.  In that case, which involved a nationwide challenge to AOL's online advertising practices, the settlement awarded its remaining funds to three *cy pres* recipients: the Legal Aid Foundation of Los Angeles, the Los Angeles and Santa Monica chapters of the Boys and Girls Club of America, and the Federal Judicial Center Foundation.  663 F.3d at 1037.  Reversing the district court's approval of that settlement, we explained that the missions of the selected organizations had nothing "to do with the objectives of the underlying statutes on which [p]laintiffs

---

[14] And to the extent the universities host seminars that are only accessible to those in San Diego, the equivalent would be true of any *cy pres* recipient, national or otherwise, that held in-person events at its headquarters.

base[d] their claims." *Id.* at 1040. As a result, the award failed to "account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." *Id.* at 1036.

That is not the case here. This award promotes a national dialogue on improving internet privacy and data security practices. It accordingly comports with our suggestion in *Nachshin* that the parties identify beneficiaries that will "work to protect internet users" from the types of predatory behavior underlying the lawsuit. *See id.* at 1041. As a result, the district court did not abuse its discretion in approving the selection of these institutions.

## ii.

Second, the alumni connections of three of the (many) involved attorneys did not impermissibly taint the selection process. In some cases, "the specter of judges and outside entities dealing in the distribution and solicitation of settlement money may create the appearance of impropriety." *Id.* at 1039. But that specter is far less haunting where, as here, the award is tethered to class members' interests and underlying claims. *See id.* Moreover, Objector has not suggested that there is a continuing relationship between the attorneys and their alma mater, nor has he challenged the parties' descriptions of what those institutions will do to further the interests of the class. Objector's bare allegation that the institutions were selected for an improper reason is insufficient to show that it was an abuse of discretion for the district court to approve their selection.

**D.**

Finally, given both the structure of this settlement agreement and the focus of Objector's challenges, we hold that it is unnecessary to reverse the entire settlement approval in conjunction with our vacatur of the fee award. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 969 (9th Cir. 2009) (reversing a fee award but otherwise affirming the settlement approval). The parties' settlement agreement expressly does not depend on approval of the fee award, and it provides that any decrease in the award "shall only serve to increase" the funds distributed to class members, as well as to the *cy pres* beneficiaries if necessary. Furthermore, because the claims period is now closed, we know that there are ample funds available to fully satisfy all submitted claims for reimbursement. Changing the size of the fee award would not affect those reimbursements. Class members will similarly receive the $20 coupons regardless of the size of the fee award. From class members' perspective, the only thing that reducing the fee award would do is to increase the amount ultimately paid to the *cy pres* recipients. We can therefore be confident that class members would not have made different decisions had they known that the fee award would be recalculated, and also that the district court would not have made a different approval decision as to whether the settlement was fair, reasonable, and adequate.

Moreover, other than the challenges to the *cy pres* award that we rejected above, Objector cabined his arguments on appeal to attacks on the fee award. We are therefore not presented here with a general challenge to the fairness of the settlement under Federal Rule of Civil Procedure 23(e)(2). Absent an explanation of why the settlement as a whole does not pass muster, we will not assume that we must

automatically reverse the settlement in conjunction with vacating the fee award.[15]

## III.

For the foregoing reasons, we **VACATE** and **REMAND** the award of attorney's fees but otherwise **AFFIRM** approval of the settlement.

---

[15] *In re Bluetooth* is not to the contrary. Although there we reversed an entire settlement based on our decision to vacate the fee award, the settlement included a "kicker" provision under which "all fees not awarded would revert to defendants rather than be added to the *cy pres* fund or otherwise benefit the class." *In re Bluetooth*, 654 F.3d. at 947. As we explained, "the kicker deprives the class of [its] full potential benefit if class counsel negotiates too much for its fees." *Id.* at 949. In contrast, any reduction in attorney's fees in this case will benefit the class. Moreover, the district court's evaluation of the fee award in *In re Bluetooth* was far more deficient than that here. As we explained in that decision, "our discomfort" stemmed in part from "the absence of [an] explicit calculation or explanation of the district court's" attorney's fee decision; there was no lodestar fee for us to even evaluate. *Id.* at 943–44. This lack of explanation undermined our confidence in the district court's settlement approval more generally. *See id.* at 949. In contrast, although the district court here erred by concluding that the credits did not qualify as coupons—which, to be sure, had a significant impact on the court's evaluation of the final fee award—it otherwise calculated the fee award in accordance with our caselaw and then justified its approval of that award.